Duane H. Mathiowetz (SBN 111831)
    mathiowetzd@howrey.com
Irene Yang (SBN 245464)
    yangi@howrey.com
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, California  94105
Telephone:  (415) 848-4900
Facsimile:  (415) 848-4999

Attorneys for Defendant
FRESNO VALVES & CASTINGS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| B-K LIGHTING, INC., a California corporation,<br><br>            Plaintiff,<br><br>    vs.<br><br>VISION3 LIGHTING, a business entity of unknown form and FRESNO VALVES & CASTINGS, INC., a California corporation,<br><br>            Defendant. | Case No. CV06-2825 MMM (PLAx)<br><br>**SUPPLEMENTAL OPPOSITION TO B-K LIGHTING, INC.'S MOTION FOR SUMMARY JUDGMENT AS TO THE VALIDITY AND ENFORCEABILITY OF B-K LIGHTING, INC.'S PATENT**<br><br>Date:      April 28, 2008<br>Time:     10:00 a.m.<br>Place:    Court Room 780<br>Judge:   Hon. Margaret M. Morrow |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II. THE '084 PATENT IS INVALID OVER THE B-K 360SL
    ALONE OR IN COMBINATION WITH HYDREL, OR
    OVER KELLY ALONE ........................................................................................ 1

    A.  B-K's Expert Kinrich Admits That the 360SL Is
        Covered by the '084 Patent, Thus Invalidating the Patent
        for Anticipation or Obviousness ................................................................ 1

        1.  If the '084 Covers the 360SL, the 360SL Must
            Anticipate It............................................................................................ 2

        2.  If the 360SL Does Not Anticipate the '084 Patent,
            It Renders It Obvious in View of Hydrel ................................................ 2

    B.  Claims 23, 26, and 27 Are Each Invalid for Anticipation
        over Kelly ................................................................................................... 4

        1.  Kelly Discloses a Stud Member ............................................................ 4

        2.  Pole 27 of Kelly is "Configured to Connect To a
            Source of Electrical Power" ................................................................... 4

        3.  The Upper End of Pole 27 of Kelly is Inserted "in
            the Base Opening and Rotationally Interact[s]
            Therewith" .............................................................................................. 5

        4.  Kelly Discloses a Second Seal .............................................................. 6

        5.  The Only Remaining Element of Claim 3 that B-K
            Contests is the First Resistance Means, Which
            Kelly Discloses........................................................................................ 6

III. THE '084 PATENT IS INVALID UNDER 35 U.S.C. § 112.................................. 8

    A.  The Tapered Opening and Tapered Post Elements are
        Not Enabled ............................................................................................... 8

    B.  Best Mode of the Tapered Opening and Tapered Post is
        Not Disclosed .......................................................................................... 10

    C.  Written Description Issues With Tapered Opening and
        Tapered Post ............................................................................................ 10

    D.  Indefiniteness of Tapered Opening and Tapered Post ................................ 10

    E.  Claims 5 and 24 are Invalid for Lack of Antecedent
        Basis........................................................................................................ 10

IV. THE '084 PATENT IS INVALID AND UNENFORCEABLE
    FOR IMPROPERLY NAMING THE INVENTORS ........................................... 12

A.     The Law of Inventorship .................................................... 12

B.     Gillespie and Case Are, At a Minimum, Co-Inventors ............................ 13

C.     Hagen's Intent to Deceive Is Clear from the Corroborated Testimony of Gillespie and Case and His Falsification of the Invention Disclosure Statement .................... 16

D.     Neither Gillespie Nor Case Assigned His Rights in the Patent to B-K .................................................... 18

E.     The Court Should Hold the '084 Patent Invalid or Unenforceable or Correct the Inventorship ................................. 18

V.    THE '084 PATENT IS UNENFORCEABLE BASED ON INEQUITABLE CONDUCT ................................................ 19

     A.     FVC Pleaded and Has Shown Inequitable Conduct for Failure to Properly Disclose the Inventors ............................. 19

     B.     Hagen and B-K Failed to Disclose Material Prior Art to the Patent Office .................................................... 21

         1.     The Hydrel 7100 and B-K's 360SL Are Material Prior Art .................................................... 21

         2.     Intent to Deceive Should be Presumed in Light of High Materiality ................................................ 23

         3.     Inequitable Conduct Has Been the Subject of Discovery .................................................... 24

VI.    CONCLUSION .................................................... 25

# TABLE OF AUTHORITIES

Page

## **CASES**

*Akron Polymer Container Corp. v. Exxel Container,*
148 F.3d 1380, 1383 (Fed. Cir. 1998) ................................................................. 20

*Albert v. Kevex Corp.,*
729 F.2d 757, 763 (Fed.Cir. 1984) ..................................................................... 17

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.,*
725 F.2d 1350, 1362 (Fed.Cir. 1987) ............................................................ 21, 22

*Baxter International Inc. v. McGaw Inc.,*
149 F.3d 1321, 1327 (Fed.Cir. 1998) .................................................................. 20

*BJ Servs. Co. v. Halliburton Energy Servs.,*
338 F.3d 1368, 1373 (Fed.Cir. 2003) .................................................................. 12

*Bruno Indep. Living Aids v. Acorn Mobility Servs.,*
394 F.3d 1348, 1351 (Fed. Cir. 2005) ............................................................ 19, 23

*Burroughs Wellcome Co. v. Barr Lab.,*
40 F.3d 1223, 1228 (Fed. Cir. 1994) .............................................................. 12, 15

*Checkpoint Sys. v. All-Tag Sec. S.A.,*
412 F.3d 1331, 1338 (Fed. Cir. 2005) ............................................................ 13, 19

*Chef Am., Inc. v. Lamb-Weston, Inc.,*
358 F.3d 1371, 1374 (Fed. Cir. 2004) .................................................................. 11

*Connell v. Sears, Roebuck & Co.,*
722 F.2d 1542, 1552 (Fed. Cir. 1983) .................................................................. 11

*Energizer Holdings v. ITC,*
435 F.3d 1366, 1368 (Fed. Cir. 2006) .................................................................. 11

*Ethicon, Inc. v. United States Surgical Corp.,*
135 F.3d 1456, 1460 (Fed.Cir. 1998) .............................................................. 12, 13

*Halliburton Co. v. Schlumberger Tech. Corp.,*
925 F.2d 1435, 1442 (Fed.Cir. 1991) .................................................................. 23

*Hayhurst v. Rosen,*
1992 WL 123178 (E.D.N.Y. 1992) ..................................................................... 19

*Helver v. Novo Industries, Inc.,*
49 U.S.P.Q.2d 1591, 1598 (S.D.Fla. 1998) .......................................................... 25

*Hoffmann-LaRoche Inc. v. Promega Corp.,*
323 F.3d 1354, 1371 (Fed.Cir. 2003) .................................................................. 16

*In re Wright*, 999 F.2d 1557 (Fed. Cir. 1993) ........................................................... 8

*Innovative Scuba Concepts, Inc. v. Feder Industries Inc.,*
819 F.Supp. 1487, 1499-1500 (D.Colo. 1993) ..................................................... 20

*Kalman v. Kimberly-Clark Corp.*,
    713 F.2d 760, 772 (Fed. Cir. 1983) ..................................................................5, 6

*Kansas Jack, Inc. v. Kuhn*,
    719 F.2d 1144, 1151 (Fed. Cir. 1983) ...................................................................20

*KSR Int'l Co. v. Teleflex Inc.*,
    127 S. Ct. 1727 (2007) ...........................................................................................7

*Lisle Corp. v. A.J. Mfg. Co.*,
    398 F.3d 1306, 1315 (Fed.Cir. 2005) .....................................................................2

*Merck & Co. v. Danbury Pharmacal Inc.*,
    873 F.2d 1418, 1420-21 (Fed.Cir. 1989) ...............................................................21

*Monsanto Co. v. Bayer Bioscience N.V.*,
    514 F.3d 1229, 1233-34 (Fed. Cir. 2008) ........................................................20, 21

*Polaroid Corp. v. Eastman Kodak Co.*,
    789 F.2d 1556, 1573 (Fed.Cir. 1986) .....................................................................2

*Pro-Mold v. Great Lakes Plastics*,
    75 F.3d 1568, 1575 (Fed. Cir. 1996) .....................................................................12

*RCA Data Corp. v. Gen. Corp.*,
    887 F.2d 1056, 1065 (Fed.Cir. 1989) .....................................................................17

*Scripps Clinic & Research Found. v. Genentech, Inc.*,
    927 F.2d 1565, 1576 (Fed. Cir. 1991) .....................................................................5

*Sitrick v. Dreamworks, LLC*,
    516 F.3d 993 (Fed. Cir. 2008) .................................................................................8

*Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*,
    810 F.2d 1113, 1117 (Fed. Cir. 1987) ...................................................................11

*Specialty Composites v. Cabot Corp.*,
    845 F.2d 981, 992 (Fed.Cir. 1988) .........................................................................24

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107, 1125 (Fed. Cir. 1985) .....................................................................5

*Stark v. Advanced Magnetics*,
    119 F.3d 1551, 1555-1556 (Fed.Cir. 1997) ...........................................................20

*Tate Access Floors, Inc. v. Interface Architectrual Res., Inc.*,
    279 F.3d 1357, 1372 (Fed. Cir. 2002) .....................................................................8

*Tiegel Mfg. Co. v. Farmer Mold & Machine Works, Inc.*,
    225 U.S.P.Q. 1051, 1061 (M.D.Fla. 1984) ............................................................23

*Trovan, Ltd. v. Sokymat SA*,
    299 F.3d 1292, 1302 (Fed. Cir. 2002) ..............................................................12, 13

*United States Gypsum Co. v. National Gypsum Co.*,
    74 F.3d 1209 (Fed. Cir. 1996) .................................................................................8

1

## STATUTES

2   35 U.S.C. § 102(b) .................................................................................................. 2

3   35 U.S.C. § 102(f) ............................................................................................. 14, 21

4   35 U.S.C. § 116 ................................................................................................... 13

5   35 U.S.C. § 256 ................................................................................................... 21

6   35 U.S.C. § 282 ................................................................................................... 12

7   37 C.F.R. § 1.291(d) (2007) .................................................................................. 8

8

## OTHER AUTHORITIES

9   1 R. Milgrim, *Milgrim on Trade Secrets*, § 5.02[4][e] (2007) ...................................... 18

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   Defendant Fresno Valves & Castings, Inc. ("FVC") hereby responds to B-K
2   Lighting, Inc.'s ("B-K") Motion for Partial Summary Judgment as to the Validity and
3   Enforceability of B-K Lighting, Inc.'s Patent.[1]

## I.   INTRODUCTION

5   Seldom will this Court encounter a patent that so deserves to be stripped of its
6   cloak of validity and enforceability as this one.  While B-K complains that FVC "is
7   attempting a shotgun approach in attacking the patent at issue in this case" (B-K
8   Memorandum at 1), the patentee has presented FVC with a panoply of defenses to
9   validity and enforceability, far more than usual.  From Douglas Hagen claiming the
10  invention of Gary Gillespie and Patrick Case as his own, which included falsifying an
11  invention disclosure statement, to withholding the most relevant prior art—a prior B-K
12  product (the 360SL) with most of the features of the claimed invention, and a
13  competitor's product identified as the closest prior art—to drafting claims that fail to
14  satisfy 35 U.S.C. § 112, and then making arguments that the Supreme Court has solidly
15  rejected, B-K has crafted a patent that deserves early extinction.  B-K's own expert has,
16  in essence, admitted that the 360SL anticipates or renders the '084 patent obvious. The
17  Court should deny B-K's motion and enter judgment for FVC.

## II.   THE '084 PATENT IS INVALID OVER THE B-K 360SL ALONE OR IN COMBINATION WITH HYDREL, OR OVER KELLY ALONE

### A.   B-K's Expert Kinrich Admits That the 360SL Is Covered by the '084 Patent, Thus Invalidating the Patent for Anticipation or Obviousness

21  B-K submitted an expert report by Jeffrey Kinrich contending that some of the
22  allegedly infringing FVC products correspond to B-K models using the 360SL knuckle.
23  (The preferred embodiment of the '084 patent is identical to and commercialized by the
24  360HD knuckle.)  He goes on to admit, based on communications with B-K's counsel,
25  that the 360SL knuckle is covered by the '084 patent:

26   I understand that the [B-K] LA, AL, SE, and K2 models use the 360HD

---

[1] Pursuant to the Court's March 31, 2008 Scheduling Order, this Opposition is deemed supplemental to FVC's Motion for Summary Judgment of Invalidity, which is deemed FVC's primary opposition.

1
2

knuckle, while the other B-K Lighting models that correspond to the allegedly infringing models use the 360SL knuckle.  Further, I understand that both the 360HD and 360SL knuckles are covered by the patent.

3

Yang Decl., Exh. 22 [March 31, 2008 Expert Report of Jeffrey H. Kinrich, at 5 n.11.]

4

### 1.   If the '084 Covers the 360SL, the 360SL Must Anticipate It

5

6

7

8

9

10

11

Since the '084 patent covers the 360SL (the 360SL would infringe except that it is B-K's product), then it must also anticipate if earlier in time. "It is established law that that which infringes, if later, anticipates if earlier." *See Lisle Corp. v. A.J. Mfg. Co.,* 398 F.3d 1306, 1315 (Fed.Cir. 2005) (plaintiff's early prototype tool similar to accused product and covered by patent in suit, and but for experimental use would have rendered patent invalid for anticipation); *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1573 (Fed.Cir. 1986).

12

13

14

15

16

17

18

19

20

21

22

The 360SL is the prior B-K product from which the 360HD developed.  B-K has not produced all relevant documents relating to the 360SL, but the evidence shows that it was in production long before the statutory bar date, i.e., more than one year prior to the May 27, 1998 filing of the provisional application.[2]  Yang Decl., Exh. 18 [360SL datasheet].  Hagen testified that a version of the 360SL was used in a custom fixture in August 1993.  Yang Decl., Exh. 5 [Hagen Tr. at 145:25; Exh. 24 [exh. 48 at #3].  A version was used in a "Nite Star" fixture in December 1994.  Yang Decl., Exh. 5 [Hagen Tr. at 147:19-148:10]; Exh. 24 [exh. 48 at #6B]. The Posi-Lock version of the 360SL was developed by April 4, 1996.  Yang Decl., Exh. 18.  Since the 360SL is admittedly covered by the '084 patent and was sold over one year before the operative filing date, it anticipates the '084 patent.

23

24

### 2.   If the 360SL Does Not Anticipate the '084 Patent, It Renders It Obvious in View of Hydrel

25

26

Assuming that B-K argues that its expert is wrong or confused, the '084 patent is

27

28

---

[2] 35 U.S.C. § 102(b) provides that a person shall <u>not</u> be entitled to a patent if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

invalid as obvious over the 360SL in view of Hydrel.  Set forth below are drawings representative of the original 360SL, which as discussed above was undeniably in the public domain more than one year prior to the critical date, and the 360SL with the L.O.C.K. feature, which B-K admits is covered by the '084 patent.  Matts Decl., Exh. 1, 2.



Original B-K Lighting 360SL Knuckle.



B-K Lighting 360SL Knuckle with L.O.C.K. Feature.

As illustrated, the two fixtures differ only by the addition of the L.O.C.K. feature.  But not only was the use of a taper for this exact application known in the art, _it was known to the purported inventor, Douglas Hagen._  Indeed, in the Invention Disclosure Statement that Hagen claims as his, it is identified as the closest prior art.  Yang Decl., Exh. 16.  Further, B-K had the following picture in its files that depicts the Hydrel tapered knuckle design. Yang Decl., Exh. 17.

Obviousness gets no clearer.  B-K admits that the '084 patent covers the 360SL with L.O.C.K.  The only difference between the 360SL with L.O.C.K. and the "original" 360SL—which B-K admits was sold more than one year before the critical date (see discussion _supra_ at Section II.A.1)—is the



Unique self releasing taper allows for infinite adjustment under load

HYDREL

tapered post and opening, i.e., "the first resistance means."  But the use of a taper for adjusting rotation was known in _this industry_ at least as early as 1994:  the picture of the Hydrel taper shown above is taken from a March 1994 catalog.  Yang Decl., Exh.

25.  Obviousness is simple:  the 360SL, plus the Hydrel taper, yields the 360SL with L.O.C.K.  One of ordinary skill in the art would know to combine the 360SL with the Hydrel taper to limit free rotation of the base member relative to the support member. Dornfeld Decl., ¶11.  That which infringes if later, anticipates—or in combination, renders obvious—if earlier.[3]  FVC's motion for summary judgment of invalidity should be granted and B-K's motion for summary judgment of validity should be denied.[4]

**B.    Claims 23, 26, and 27 Are Each Invalid for Anticipation over Kelly**

B-K argues only that Kelly does not disclose a stud member, second seal, or first resistance means.  Thus, B-K apparently concedes that Kelly discloses all other elements of claims 3, 23, 26, and 27, including an adjustable mount for a light fixture, a support member, a base member, a first locking means, a first seal, and a second locking means. Accordingly, FVC limits its response below to the elements B-K contends are missing.

**1.    Kelly Discloses a Stud Member**

B-K inaccurately reads Kelly as failing to disclose a stud member, which FVC has repeatedly identified as pole 27.  Kelly discloses both the "lower end configured to connect to a source of electrical power" and "said upper end of said stud member in said base opening and rotationally interacting therewith."  B-K does not quarrel with the rest of the "stud member" sub-elements, presumably admitting that Kelly discloses them.

**2.    Pole 27 of Kelly is "Configured to Connect To a Source of Electrical Power"**

B-K incorrectly argues that pole 27 is not configured to connect to a source of electrical power.  Kelly discloses that "it is also desirable to have the electrical

---

[3] Mr. Kinrich is motivated to include the 360SL as covered by the '084 patent, to maximize lost profits damages.  B-K may argue, contrary to its expert, that the 360SL was not covered by the surrendered '948 patent and subsequent '084 patent until B-K changed its design to incorporate what it refers to as its L.O.C.K. feature, which it developed subsequent to FVC's K2 knuckle.  As set forth in the main text, however, the case for obviousness has been made clear by even a claim that the 360SL with L.O.C.K. is covered by the '084 patent.

[4] B-K has not provided through discovery any information about secondary considerations of nonobviousness; therefore, FVC reserves the right to submit arguments and evidence should B-K present any evidence of secondary considerations in the future.

1   connections between the power lines and the leads to the luminaire located in an area that

2   is not exposed to the weather, in order to limit electrical failures."  Yang Decl., Exh. 1 at

3   1:28-32.  Kelly also contemplates that in normal operation, the invention calls for power

4   lines to be introduced through the pole and into the rest of the mount to a <u>lighting</u> fixture.

5   *Id*. at 1:41-43; 2:49-50; 5:3-5.  B-K apparently limited its analysis to looking at the

6   figures, which concededly do not show the lower end of the pole 27, and failed to peruse

7   the specification text.  A prior art reference need not discuss the '084 patent claim

8   element in the same words; it merely has to disclose the element.  *See Kalman v.*

9   *Kimberly-Clark Corp.*, 713 F.2d 760, 772 (Fed. Cir. 1983) (overruled in part on other

10  grounds by *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1125 (Fed. Cir.

11  1985)).  One of ordinary skill in the art reading the patent knows that Kelly discloses pole

12  27 as connected to a source of electrical power.[5]  Dornfeld Decl., ¶4.  Thus, Kelly

13  discloses this sub-element.

**3.      The Upper End of Pole 27 of Kelly is Inserted "in the Base
Opening and Rotationally Interact[s] Therewith"**

16      B-K finds it impossible to imagine that a round pole inserted into a substantially

17  square opening could ever frictionally interact or allow frictional rotation.  The flaw here

18  is that if a round item is centered and seated tightly in an opening, friction exists at all

19  points of contact.  Dornfeld Decl., ¶5.  Figure 5 of Kelly, which shows contact in each

20  cardinal direction, illustrates this concept.  Frictional rotation necessarily accompanies

21  any snug pole-base portion interaction.  *See* Yang Decl., Exh. 1 at 5:27-34.

22      B-K further argues that using set screws to lock the pole in place relative to the

23  base portion is mutually exclusive with "frictional rotational interaction."  The set screws

24  in Kelly secure the pole and base portion together.  *Id*. at 3:3-4; 5:41-44.  However, under

25  the Court's construction, the upper end of the stud member and the base portion opening

26  _____

27  [5] For anticipation to exist, one of ordinary skill in the art must view no difference between the claimed
    invention and the prior art reference.  *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d

28  1565, 1576 (Fed. Cir. 1991).

must <u>allow frictional rotation</u> relative to each other.  It does not follow that the pole and the base portion must be constantly rotatable.  Rather, the device must allow for frictional rotation whenever appropriate, such as while centering and seating the pole according to Kelly.  *Id*. at 2:60-65; 5:27-34.  The presence of set screws is separate from whether the two may frictionally rotate.  Kelly therefore discloses the stud member of the '084 patent.

### 4.   Kelly Discloses a Second Seal

B-K's argument that Kelly does not include a seal between the upper end of the pole and the base opening is also wrong.  A prior art reference need not use identical language; it merely must disclose the element.  *See Kalman*, 713 F.2d at 772.  The second seal element in the '084 patent is not limited to any particular type of seal; the Court construed it as "a seal for sealing the connection of said base member to said support member and equivalents thereof."  In Kelly, the pole seated in the base portion creates a seal against moisture and contaminants due to the tight fit between the two.  *See* Yang Decl., Exh. 1 at 2:60-65; 5:31-37; Dornfeld Decl., ¶6.  Furthermore, an object of the invention in Kelly is to protect electrical connections from the weather (which includes moisture and contaminants) and ensure a robust connection of the parts, allowing poles of different sizes to be used.  Yang Decl., Exh. 1 at 1:28-40.  Kelly thus has a second seal.

As the only elements of claims 23, 26, and 27 that B-K contests are sub-elements of the stud member and the second seal, which FVC has shown Kelly to disclose, Kelly anticipates claims 23, 26, and 27.

### 5.   The Only Remaining Element of Claim 3 that B-K Contests is the First Resistance Means, Which Kelly Discloses

FVC will not contest whether Kelly anticipates claim 3 of the '084 patent.  When FVC revisited its anticipation analysis in light of the Court's claim construction, in the spirit of narrowing the issues for trial, it decided against asserting anticipation of claim 3.

Nevertheless, because B-K has raised the tapered opening and tapered post

elements in Kelly as an issue (Statement of Uncontroverted Facts #4), FVC responds.[6]  In Kelly, trunnion 75 in base member 33 is received by a cooperative tapered opening 63 in support member 31.  *Id.* (Figures 3-5; 4:20-47).   It is clear from Figure 4 (underneath the "77") that opening 63 is tapered and the trunnion is sized and configured to fit into that tapered opening.[7]  A person of ordinary skill in the art would know that a trunnion disclosed to fit into a tapered opening could be modified into a tapered trunnion.  Such a modification would allow the Kelly trunnion to better fit the tapered opening and provide more surface area for frictional pivoting.  Dornfeld Decl., ¶7.

B-K argues that Kelly teaches away from the first resistance means of the '084 patent because the ribs 81 and 83 provide additional locking effect and help to sustain the desired position. Yang Decl., Exh. 1 at 4:35-49.  Whether the ribs provide resistance to pivoting when bolt 79 is loosened is irrelevant.

B-K also distorts the prosecution history of the '084 patent.  Notably, the entire reissue prosecution proceeded under the umbrella of old law.  The law has changed significantly since *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727 (2007).  Thus, arguments made during the reissue prosecution about the obviousness of the first resistance means in Kelly are not binding on the current suit.  Specifically, B-K's Response to the Protest relies on old standards that are no longer the law.  Declaration of Taylor Foss in support of B-K Lighting, Inc.'s Motions for Summary Judgment (Docket No. 118-4)("Foss Decl."), Exh. 23.  The portion of the Response that B-K relies on discusses obviousness under a standard that *KSR* emphatically disapproved of.[8]  The applicant's arguments in that portion of its Response are moot.[9]  FVC made no

---

[6]  As FVC does not argue anticipation by Kelly here, its discussion is made in an obviousness context.
[7] The Court noted in footnote 73 of its Claim Construction Order that a trunnion and a horizontally projecting post, such as the one in the '084 patent, may be indistinguishable.  Docket No. 114.
[8] Under *KSR*, the courts should recognize that "familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle."  *KSR*, 127 S. Ct. at 1732.  Obviousness is no longer confined to a formalistic conception of "teaching, suggestion, and motivation.  *Id.* at 1742.
[9] Further, the Office Action that B-K cites (Foss Decl. Exh. 24-7, 24-8) does not even mention either Kelly or the first resistance means, so there is no indication that the PTO approved of B-K's position.

HOWREY LLP

1   concessions in its Protest during the reissue prosecution.  Foss Decl., Exh. 22.  Moreover,

2   FVC is not bound to only the arguments raised in the Protest.[10]  Since that time, this

3   litigation commenced, it proceeded through discovery, and the Court issued its Claim

4   Construction Order.  Thus, FVC may raise additional arguments.

5   **III.    THE '084 PATENT IS INVALID UNDER 35 U.S.C. § 112**

6        Section 112 issues are separate from claim construction.  *See Tate Access Floors,*

7   *Inc. v. Interface Architectrual Res., Inc.*, 279 F.3d 1357, 1372 (Fed. Cir. 2002) (claim

8   construction is a separate issue from validity, and courts will construe claims if necessary

9   in a way that renders the claim invalid).  They are distinct issues that are resolved

10  separately and are appropriate for summary judgment.  *See United States Gypsum Co. v.*

11  *National Gypsum Co.*, 74 F.3d 1209 (Fed. Cir. 1996) (affirming summary judgment of

12  invalidity for failure to disclose best mode); *Sitrick v. Dreamworks, LLC*, 516 F.3d 993

13  (Fed. Cir. 2008) (affirming summary judgment of non-enablement).

14       **A.    The Tapered Opening and Tapered Post Elements are Not Enabled**

15       A patent claim is invalid for noncompliance with the enablement requirement of 35

16  U.S.C. § 112 if the specification does not enable one of ordinary skill to practice the

17  invention without undue experimentation.  *In re Wright*, 999 F.2d 1557 (Fed. Cir. 1993).

18       Contrary to B-K's bald assertion, plenty of discovery taken in this case supports a

19  finding of non-enablement, sufficient to raise a genuine issue of material fact.  The

20  specification does not provide any numerical recommendation for the taper angle; the

21  relative depth or length of the taper; or that the taper ought to be self-releasing, as

22  opposed to self-locking.  However, discovery already taken addresses all these issues.

23       First, B-K cites to only the portion of Patrick Case's testimony where he stated that

24  the angle of the taper was chosen "arbitrarily at the beginning, and never deviated."  Foss

25  Decl., Exh. 9 at 31:25-32:6.  But Mr. Case also testified that the device was prototyped

26

27

28

---

[10] Protests are ex parte once filed.  No further input is accepted from the protestor, including further argument concerning the prior art.  37 C.F.R. § 1.291(d) (2007).

numerous times over the course of two or three weeks.  Yang Decl., Exh. 2 at 31:12-19; 35:6-10.  The taper was designed to be "easily self-releasing" and "was well away from the transition between self-holding and self-releasing" tapers.  *Id*. at 32:10-23.  Finally, the taper length was specifically selected.  *Id*. at 33:5-14.

Nor does B-K cite to the testimony of David Counts, who testified that the taper angle was the result of experimentation to find a self-releasing taper (a taper that does not lock up).  Yang Decl., Exh. 3 at 24:2-11.

More importantly, B-K does not cite to Gary Gillespie's testimony, that "anything over 16 degrees in machinery terms is considered a self-releasing taper" and that B-K "came up with something larger than 16 degrees."  Yang Decl., Exh. 4 at 29:7-13.  In addition, Mr. Gillespie testified that experimentation was necessary to perfect the taper, and B-K made different prototypes.  *Id*. at 28:3-30:18.  Mr. Gillespie's testimony that he, an experienced mechanical design engineer, was "surprised" and "very, very shocked" that the final taper actually worked, indicates that one of ordinary skill in the art would indeed require undue experimentation to recreate the alleged invention.  *Id*. at 30:17-18.

Finally, whether Monte Matts was able to generate schematics and renderings from the '084 patent to illustrate the components' relative placement is irrelevant to whether the specification is enabling.  Generating illustrations is not the same as making and using a physical embodiment of the alleged invention.  The fact that Mr. Matts "was able to draw and identify both the 'tapered opening' and the 'tapered post' elements" means only that he used the figures of the '084 patent, his memory, and public samples to approximate the alleged invention.  Memorandum at 14; *see* Declaration of Monte Matts In Support of FVC's Motion for Summary Judgment of No Infringement [Docket No. 137], ¶18; Exhs. G-L.  It has no bearing on whether one of ordinary skill would require undue experimentation to make and use the claimed invention.[11]  In addition, the Court's decision that the words "tapered," "opening," and "post" are commonly understood does

---

[11] FVC notes that B-K has apparently admitted that Mr. Matts' renderings are accurate.

1  not render these claim terms enabled.  The Court did not address enablement during

2  claim construction, and whether it believed the words required construction is separate

3  from the steps one of ordinary skill would take to put the claimed invention into practice.

4  **B.    Best Mode of the Tapered Opening and Tapered Post is Not Disclosed**

5  The same testimony that supports a finding a non-enablement likewise supports a

6  finding of lack of best mode, again raising a genuine issue of material fact.  In addition,

7  B-K misrepresents Douglas Hagen's testimony.  Mr. Hagen testified that he did not know

8  the angle of the taper on the 360HD product manufactured today, and at the time of

9  development he was not <u>personally</u> responsible for deciding on the angle of the taper.

10  However, he admitted that "someone had to" have figured out the angle.  Yang Decl.,

11  Exh. 5 at 67:16-68:14; 73:7-9.  Thus, B-K knew of a best mode for the tapered opening

12  and tapered post.  To the extent that Hagen himself did not know anything about it, that is

13  because he did not invent it, as discussed below.

14  **C.    Written Description Issues With Tapered Opening and Tapered Post**

15  Once again, in the spirit of narrowing the issues for trial, FVC will not argue that

16  the "tapered opening" and "tapered post" elements of the '084 patent claims are missing

17  from the written description.[12]

18  **D.    Indefiniteness of Tapered Opening and Tapered Post**

19  To narrow the issues, FVC will not argue that the "tapered opening" and "tapered

20  post" elements of the '084 patent claims are indefinite.

21  **E.    Claims 5 and 24 are Invalid for Lack of Antecedent Basis**

22  Lack of antecedent basis raises another indefiniteness issue.  A patent examiner is

23  not perfect; he may overlook issues.  The fact that an examiner is supposed to correct

24

25  _____

26  [12] To the extent that B-K included this as a Statement of Uncontroverted Fact, however, FVC briefly responds to the points raised.  Although B-K asserts that the angle of the taper was arbitrarily chosen and never deviated, there is much deposition testimony to the contrary, as discussed.  One of ordinary skill in the art cannot visualize or recognize the tapered opening and tapered post based solely on the

27  '084 patent disclosure.  Dornfeld Decl., ¶9.  Finally, the fact that Mr. Matts was able to use the '084 patent figures to approximate the alleged invention does not mean that the standard for Section 112 written description is met.

28

1  antecedent basis issues does not mean that occasionally one or two will not occur.  *See*

2  *Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*, 810 F.2d 1113, 1117 (Fed. Cir.

3  1987) (original examiner did not observe missing antecedent clause).  Each claim stands

4  on its own merits.  35 U.S.C. § 282; *see Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542,

5  1552 (Fed. Cir. 1983).  Further, the patentee is bound by whatever claim language he

6  chose and cannot later request a court to redraft or interpret it to suddenly make it valid.

7  *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).  By

8  asking the Court to find these claims definite, B-K is really asking the Court to redraft

9  them, which the case law explicitly prohibits.  B-K is bound by the language it chose.

10      Further, the Manual of Patent Examining Procedure § 2173.05(e) does not support

11  B-K's position.  A claim term lacks antecedent basis "where a claim refers to 'said lever'

12  or 'the lever,' where <u>the claim</u> contains no earlier recitation of limitation of a lever and

13  where it would be unclear as to what element the limitation was making reference,"—the

14  exact situation FVC faces in claims 5 and 24.  Viewing claim 5 standing alone, as it must,

15  there is no disclosure of a <u>first</u> resistance means to buttress the <u>second</u> resistance means.

16  A second of something requires a first.  A third requires a second.  *See* Yang Decl., Exh.

17  6 (Webster's Ninth New Collegiate Dictionary) at 466, 1060, 1226 (defining "first" as

18  "preceding all others in time, order, or importance"; defining "second" as "next to the

19  first in place or time"; defining "third" as "being next to the second in place or time").

20  Looking at claim 24 standing alone, there is no disclosure of a <u>second</u> seal to give rise to

21  a <u>third</u> seal.  The terms "first," "second," and "third" are different identifiers.

22      B-K's claim that the patentee acted as his own lexicographer here with respect to

23  the terms "first," "second," and "third" falls flat, as there is no indication in the patent

24  specification that he intended for the common terms "first," "second," and "third" to have

25  any special meaning.  If B-K truly wanted to confirm its own lexicography it should have

26  requested construction.[13]  Instead, one of ordinary skill in the art reading the patent is left

27

28  [13] The case B-K cites to is inapposite.  In *Energizer Holdings v. ITC*, 435 F.3d 1366, 1368 (Fed. Cir. 2006), the term at issue – "said zinc anode" – was not indefinite for lack of antecedent basis, where

<span style="float:right">(Continued...)</span>

to wonder whether an element is missing and to what the claimed elements refer. Consequently, claims 5 and 24 are both indefinite for lack of proper antecedent basis.

## IV.   THE '084 PATENT IS INVALID AND UNENFORCEABLE FOR IMPROPERLY NAMING THE INVENTORS

### A.   The Law of Inventorship

35 U.S.C. § 116 provides that "when an invention is made by two or more persons jointly, they shall apply for patent jointly."  To be a joint inventor, one must contribute to the conception of an invention.  *Pro-Mold v. Great Lakes Plastics,* 75 F.3d 1568, 1575 (Fed. Cir. 1996).  Conception is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice.  *Burroughs Wellcome Co. v. Barr Lab.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994).  "An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue."  *Id.*   Conception, and consequently inventorship, are questions of law, to be resolved based on underlying facts.  *Ethicon, Inc. v. United States Surgical Corp.,* 135 F.3d 1456, 1460 (Fed.Cir. 1998).  The inventorship analysis, like the infringement or invalidity analysis, first requires construction of each disputed claim to determine the subject matter encompassed thereby.  The second step compares the alleged contributions of each asserted co-inventor with the subject matter of the correctly construed claim to determine whether the correct inventors were named.  *Trovan, Ltd. v. Sokymat SA*, 299 F.3d 1292, 1302 (Fed. Cir. 2002).

Each joint inventor must contribute in a significant manner to the conception of the invention.  *BJ Servs. Co. v. Halliburton Energy Servs.,* 338 F.3d 1368, 1373 (Fed.Cir. 2003).  But because co-inventors need not contribute to the subject matter of every claim

---

(...Continued)

there was "an anode gel comprised of zinc as the active anode ingredient" earlier in the claim.  *Id.* at 1369.  Such is not the case here; there is no other resistance means in claim 5, and the only other seal in claim 24 is undoubtedly directed at a different feature.

1   of the patent, inventorship is determined on a claim-by-claim basis. *Trovan*, 299 F.3d at

2   1302. Each of the joint inventors need not make the same type or amount of contribution

3   to the invention, but need only perform a part of the task that produces the invention.

4   One who does not have a firm and definite idea of the claimed combination as a whole

5   does not qualify as a joint inventor. *Ethicon*, 135 F.3d at 1460.

6       35 U.S.C. § 102(f) provides that a person shall be entitled to a patent unless "he

7   himself did not invent the subject matter sought to be patented." Thus § 102(f) mandates

8   that a patent accurately list the correct inventors of a claimed invention. A patent is

9   invalid if it names more or fewer than the true inventors. *Checkpoint Sys. v. All-Tag Sec.*

10  *S.A.*, 412 F.3d 1331, 1338 (Fed. Cir. 2005).

11      Douglas Hagen, the purported sole inventor, <u>at most</u> suggested to two

12  employees in the engineering department, Gary Gillespie and Patrick Case, that they

13  consider using a taper to improve over the prior B-K design to hold the vertical

14  adjustment of the light fixture. The evidence B-K puts forth in its motion actually

15  confirms that Mr. Hagen is <u>not</u> an inventor, as he never disclosed a permanent or definite

16  idea of the <u>complete and operative invention</u>, as it is thereafter to be applied in practice.

**B.    Gillespie and Case Are, At a Minimum, Co-Inventors**

18      Messrs. Gillespie and Case were the true inventors of the invention claimed in

19  the '084 patent. In its motion for summary judgment, B-K selectively limited the

20  testimony of Mr. Hagen and Mr. Gillespie (whose veracity B-K does not question,

21  unlike its attack on Mr. Case) to those passages in which they discussed Mr. Hagen's

22  contribution to the concept of using a "taper," claiming that Mr. Gillespie was at best

23  equivocal in suggesting who came up with the "idea" of using a taper. However,

24  following lengthy testimony about the design of the taper, Mr. Gillespie agreed that it

25  was fair to say that Mr. Hagen did not provide any input with respect to the <u>actual</u>

26  <u>design of the tapered element</u>. Yang Decl. Exh. 4 (Gillespie Tr.) at 30:19-31:4. Mr.

27  Gillespie testified that he was familiar with tapers from his days as a machinist. *Id.* at

28  26:15-24. It was Mr. Gillespie who developed the details of the taper design (including

1  preparing the drawings that are in the '084 patent), and Mr. Case who developed the
2  wireway.  *Id.* at 27:7-17.

3  Mr. Gillespie then testified at length regarding how the angle of the taper, in
4  particular, was selected.  When asked if there were particular problems that had to be
5  overcome in designing the taper, Mr. Gillespie offered resolutely, "Absolutely."  *Id.* at
6  28:10.  First, he stated that the tolerances were critical, and the first few tapers they tried
7  did not work "because the tapers were in the wrong position for lock-up and such."  *Id.* at
8  28:10-29:4.  He testified that they had to play with the angle of the taper to find the right
9  angle, since "anything approaching [16 degrees] wouldn't release on its own.  So, I know
10  we came up with something larger than 16 degrees.  And we played with that angle until
11  we came up with an angle that was—that could be forced apart with the pressure of the
12  O-ring seal given a certain udometer of O-ring…, and then allow the fixture to be
13  adjusted and relocked."  *Id.* at 29:10-19.  "Trial and error" was necessary to come up with
14  dimensions he described as "critical."  Indeed, "the whole success of this knuckle was
15  based on [getting the knuckle to lock up at a given point in the axial direction given the
16  O-ring seal."  *Id.* at 45:14 -46:19.  When asked if Mr. Hagen provided any details about
17  how the taper should be designed, Mr. Gillespie said "Absolutely not."  *Id.* at 30:19-31:4.

18  Mr. Hagen, on the other hand, admitted early and often that he did not know the
19  details of how the taper should be designed, notwithstanding that "the full set of
20  parameters," including angle of the taper, depth, diameter, compression, and "all kinds of
21  other issues" was critical.  Yang Decl., Exh. 5 (Hagen Tr.) at 68:4-14.[14]  He personally
22  had nothing to do with deciding on the particular angle of taper, although "someone in
23  the company had to."  Nor did he select the manufacturing tolerances that Mr. Gillespie
24  described as critical, and which he described as "play[ing] a huge role in what the total

25

26  [14] Mr. Hagen did not know the meaning of "self-releasing."  *Id.* at 62:11-14.  He did not know if the
27  taper in the '084 ('948) patent is self-releasing or self-locking.  He did not know if a decision was
   made to use one or the other.  Yang Decl., Exh. 5 (Hagen Tr.) at 63:10-25.  He knew so little, in fact,
   that he ultimately claimed that the taper used in the commercial embodiment, the 360HD, uses "a
28  combination of both," because "there's a magnitude of locking and releasing."  *Id.* at 67:8-15.

1   surface area of contact was, what the—whether we would achieve compression of the O-

2   ring, or we would over-compress.  It would greatly affect its locking ability.  If you're at

3   a tolerance it would lock up and never come, as you call it, nonreleasing, or—I mean

4   those are the issues of tolerance.  *Id*. at 76:23-77:19.

5        The law requires that Mr. Hagen have done more than toss the term "taper" into

6   the conversation to satisfy the conception requirement of inventorship.  Conception is

7   more than identifying an abstract concept; it is the formation in the mind of the inventor

8   of a definite and permanent idea of the <u>complete and operative invention, as it thereafter</u>

9   <u>is to be applied in practice</u>.  *Burroughs Wellcome Co.,* 40 F.3d at 1228.  Designing a

10  working taper required not only deciding if it should be self-locking or self-releasing, but

11  also the angle, depth, diameter, compression, and "all kinds of other issues" that Mr.

12  Hagen testified were critical.  These critical elements were admittedly developed by Mr.

13  Gillespie and/or Mr. Case.  They, not Mr. Hagen, invented the tapered elements.

14       But the taper is just one of multiple elements of the patented invention, and to the

15  extent that Messrs. Gillespie and Case conceived of the complete and operative elements

16  claimed in the '084 patent, they are inventors.  Not surprisingly, B-K ignores almost

17  every other element.  It is clear from Mr. Gillespie's testimony that he and/or Mr. Case

18  designed the following elements of the asserted claims, with <u>no</u> input from Mr. Hagen

19  about engineering decisions.  At most, Mr. Hagen was concerned that the new product

20  should look like the old.  Yang Decl., Exh. 4 (Gillespie Tr.) at 24:21-25:5.

21   •   First sealing means (O-ring between the tapered post of the base member
         and the tapered opening of the support member)—Yang Decl., Exh. 4
22       (Gillespie Tr.) at 32:5-10.

23   •   Support member—*Id.* at 33:14-34:7

24   •   Wire passageways—*Id.* at 34:9-35:18; 35:25-36:19; 38:2-7; 44:5-19;
         51:23-52:22

25   •   Base member—*Id.* at 36:20-37

26   •   Stud member—*Id.* at 41:2-23

27   •   Second locking means—*Id.* at 44:20-45:1

     •   First resistance means—*Id.* at 45:2-46:25

28   •   Second resistance means—*Id.* at 48:2-16

- Second sealing means—*Id.* at 49:20-50:12 ("[t]his one was particularly critical… this one was a bit of a challenge that we couldn't get from a book. We had to trial and error prototype this one.")
- Rotational limiting means—*Id.* at 52:23-54:1

Mr. Case corroborated Mr. Gillespie's testimony, and vice versa. In addition, Mr. Gillespie identified numerous documents showing his contributions to the invention claimed. *Id.* at 57:12-66:5; Yang Decl., Exhs. 7-8 (Exhs. 7-8 to Gillespie Tr.).

Mr. Case was equally unequivocal about the role that he and Mr. Gillespie played in the design and development of the patented invention, and Mr. Hagen's lack of involvement in the detailed design. He testified that Mr. Hagen did not provide any direction as far as how the design should be done. Mr. Hagen's role was limited to telling Messrs. Case and Gillespie that the design goal was to "be able to stand on the fixture and maintain its elevation locking position. Yang Decl., Exh. 2 (Case Tr.) at 20:25-21:10. Mr. Case testified that each of the claimed elements of the '084 ('948) patent was designed by himself and Mr. Gillespie. *Id.* at 30:20-51:13. He corroborated his design efforts by identifying entries in his engineering notebooks prepared at the time of the design and development of the claimed invention. *Id.* at 53:2-67:24; Yang Decl., Exhs. 9-10 (Exhibits 11, 12 to Case Tr.). In line with the personal attacks on Mr. Case's character and credibility, B-K's assertion that he "never testified that he himself conceived of the tapered locking mechanism, <u>or any other element of the claimed invention</u>," is utterly false, as the record demonstrates.

## C. Hagen's Intent to Deceive Is Clear from the Corroborated Testimony of Gillespie and Case and His Falsification of the Invention Disclosure Statement

B-K contends that "there is simply no evidence of deceptive intent with respect to the naming of Hagen as the sole inventor." Memorandum at 21. Just as for inequitable conduct, discussed below, there is seldom direct evidence of deceptive intent. Instead, intent is proven inferentially and does not require a confession by the inventor or the prosecuting attorney. *Hoffmann-LaRoche Inc. v. Promega Corp.,* 323 F.3d 1354, 1371 (Fed.Cir. 2003); *see also RCA Data Corp. v. Gen. Corp.,* 887 F.2d 1056, 1065 (Fed.Cir.

1  1989) (direct proof of subjective wrongful intent not necessary to show intent to deceive).

2  Intent is a factual matter that is rarely free from dispute. *Albert v. Kevex Corp.,* 729 F.2d

3  757, 763 (Fed.Cir. 1984).  Here, the overwhelming evidence shows that Mr. Hagen did

4  not conceive of every element of the '084 patent and may not have conceived of any.

5      B-K's assertion that Mr. Case did not complain about being left off the '084 ('948)

6  patent as an inventor and assisted in the application process is also misleading.  Mr. Case

7  confirmed that he worked on another application for which he was named inventor, the

8  anti-condensation valve ("ACV") patent, but he did not confirm that he had worked on

9  the application for the 360HD.  Yang Decl., Exh. 2 (Case Tr.) at 103:5-24.  When Mr.

10  Case was shown an invention disclosure statement for the 360HD (the commercial

11  embodiment of the claimed invention) at his deposition, he testified that he filled out only

12  sections three (date of invention), six (background of the invention) and seven (details of

13  the invention).  Mr. Hagen filled in the rest, including his own name as the purported

14  inventor. *Id*. at 105:8-106:6.  In other words, the invention disclosure form on which B-

15  K now seeks to rely to demonstrate that Mr. Hagen is the inventor was not even prepared

16  by Mr. Hagen, but by Mr. Case.  Mr. Case also filled out an invention disclosure at the

17  same time for another invention, the ACV.  Again, although Mr. Case prepared most of

18  the disclosure, Mr. Hagen filled in the inventor's name and the title of the invention, but

19  this time identified Mr. Case as the inventor.

20      B-K also insists that since Mr. Case was named on three U.S. Patents assigned to

21  B-K "while employed there," there is no deceptive intent.  That, too, is misleading, since

22  Mr. Case testified that he was an inventor on U.S. Patent No. 7,033,038, having designed

23  the housing and the barrier plate and a majority of the internal components, but left

24  unnamed on the patent.  Mr. Hagen, who did nothing more than specif[y] design

25  requirements" claimed that invention for himself as well. *Id*. at 72:7-74:6.  Similarly, Mr.

26  Case testified that he also contributed significantly to an invention for slip resistant glass

27  but refused to sign the application after he left the company. *Id*. at 74:9-75:1.  That

28  patent subsequently issued at U.S. Patent No. 7,175,297, naming Mr. Hagen as the sole

1  inventor.  Yang Decl., Exh. 5 (Hagen Tr.) at 165:14-8.

2  **D.     Neither Gillespie Nor Case Assigned His Rights in the Patent to B-K**

3      B-K asserts that "as Case assigned his inventions to B-K Lighting while employed

4  there in any event, there would have been no motive whatsoever for concealing him as an

5  inventor if he were one."  Memorandum at 22.  The underlying premise is incorrect.  Mr.

6  Case signed such an agreement during his second term of employment at B-K, but not his

7  first.  Yang Decl., Exh. 2 (Case Tr.) at 12:5-21.  Likewise, Mr. Gillespie never signed an

8  agreement assigning his inventions to B-K.  Yang Decl., Exh. 4 (Gillespie Tr.) at 11:17-

9  12:9.  This was confirmed by B-K's inability or refusal to produce any such employment

10 or invention assignment agreements.

11     The fact that neither Mr. Gillespie nor Mr. Case assigned his rights to the '948

12 ('084) patent is significant.  Absent an assignment of rights, such as by an employment

13 contract, those rights remain with the inventor, subject only to the employer's shop rights

14 in the inventions.  1 R. Milgrim, *Milgrim on Trade Secrets*, § 5.02[4][e] (2007).  Any

15 finding by the Court that they are true inventors, with a corresponding order to correct

16 inventorship, will render Messrs. Gillespie and Case co-owners of the '084 patent.  As

17 such, B-K does not own the entire right to the patent and cannot, without joining all the

18 owners, sue for infringement.

19 **E.     The Court Should Hold the '084 Patent Invalid or Unenforceable or
   Correct the Inventorship**

20
21     The evidence is clear and convincing that, at a minimum, Messrs. Gillespie and

22 Case are co-inventors on the '084 patent.  Mr. Hagen only offered up the "concept" of

23 using a taper, but he is <u>not</u> an inventor inasmuch as he never disclosed a definite and

24 permanent idea of the <u>complete and operative invention</u>, as thereafter to be applied in

25 practice.  Even if the Court finds that Mr. Hagen provided sufficient disclosure of the

26 tapered post to qualify him as an inventor, that element is not even claimed in Claims 5,

27 7, 8, or 23-31.   At most he would be an inventor on the claims reciting the "first

28 resistance means" limitation.  Either way, Mr. Hagen has acted with deceptive intent by

claiming that he is the sole inventor of the patent in suit. Therefore, inventorship cannot be corrected under 35 U.S.C. § 256, and the patent is invalid under 35 U.S.C. § 102(f).

If the Court concludes that Hagen is not the sole inventor but did not act with deceptive intent, then the appropriate remedy is to issue an order correcting the inventorship, to be filed with the Patent Office.

## V.   THE '084 PATENT IS UNENFORCEABLE BASED ON INEQUITABLE CONDUCT

### A.   FVC Pleaded and Has Shown Inequitable Conduct for Failure to Properly Disclose the Inventors

B-K also moves for summary judgment that the '084 patent is not unenforceable for inequitable conduct. B-K contends that the defense was never pled. Even a cursory review of FVC's responsive pleadings demonstrates that it is wrong. At paragraph 52 of Count I of Counterclaim (Declaration of Invalidity, Unenforceability, and Non-Infringement) in its Answer, Affirmative Defenses and Counterclaim to [B-K's] First Amended Complaint, FVC asserts that the '084 patent is "invalid and unenforceable for improperly and with deceptive intent naming the correct inventor(s)." Likewise, at paragraph 51, FVC contends that the '084 patent is invalid, null, void, and/or unenforceable for failure to comply with the conditions and requirements for patentablility specified in Title 35 U.S.C., including, but not limited to, 35 U.S.C. §§ 102, 103, and/or 112." As noted above at Section IV.A, 35 U.S.C. § 102(f) mandates that a patent accurately list the correct inventors of a claimed invention, and the failure to do so renders the patent invalid. *See Checkpoint Sys*., 412 F.3d at 1338. Seeking a patent for subject matter invented by another may constitute inequitable conduct. *Hayhurst v. Rosen,* 1992 WL 123178 (E.D.N.Y. 1992).

An applicant for a patent is under a duty of candor in dealing with the Patent Office. *Bruno Indep. Living Aids v. Acorn Mobility Servs.*, 394 F.3d 1348, 1351 (Fed. Cir. 2005). A breach of that duty constitutes "inequitable conduct' or, in severe form, "fraud." *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1233-34 (Fed. Cir.

2008); *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed. Cir. 1983).  A breach may occur by misrepresentation or omission of material information through bad faith or gross negligence.  *Baxter International Inc. v. McGaw Inc.,* 149 F.3d 1321, 1327 (Fed.Cir. 1998); *Akron Polymer Container Corp. v. Exxel Container,* 148 F.3d 1380, 1383 (Fed. Cir. 1998)("The offense [of inequitable conduct] is committed most commonly by intentional failures to submit material references to an examiner, or by making knowing false or misleading statements to the examiner").

The duty of candor applies to all contacts with the Patent Office during the course of the prosecution of an application for a patent.  Areas of particular concern are (1) the statutory oath of inventorship; (2) the citation of known relevant prior art; (3) the use of affidavits concerning the date of invention; and (4) the use of affidavits presenting factual evidence on patentablility.  *Innovative Scuba Concepts, Inc. v. Feder Industries Inc.*, 819 F.Supp. 1487, 1499-1500 (D.Colo. 1993).

The purported inventor, Mr. Hagen, and his patent counsel submitted false affidavits to the Patent Office during prosecution of the '948 and '084 patents.  Knowing that he alone did not invent the claimed inventions, Mr. Hagen on three separate occasions signed an oath, under penalty of perjury, claiming to be the sole inventor, and filed that oath with the Patent Office.  Yang Decl., Exhs. 12, 13, and 14.  A patent may be unenforceable for inequitable conduct when any co-inventors are omitted with deceptive intent.  *Stark v. Advanced Magnetics*, 119 F.3d 1551, 1555-1556 (Fed.Cir. 1997).

Even if Mr. Hagen could, for sake of argument, contend that he was unfamiliar with the requirements for inventorship, his patent counsel cannot make a similar claim.  Nor can his patent counsel allege that they lacked the knowledge that at least Patrick Case should have been a named inventor, since Mr. Case turned his engineering notebooks—clearly identifying and chronicling his involvement in the design of the 360HD—over to B-K's counsel prior to the filing of the reissue application.  Yang Decl., Exh. 2 (Case Tr.) at 53:2-55:8.  Furthermore, Mr. Case prepared a disclosure of his involvement in the design of the 360HD at the request of B-K's counsel during litigation

between B-K and Kim Lighting in the Eastern District of California prior to filing the reissue application.  B-K has refused to produce that document, claiming attorney-client and work product privileges, presumptively because the contents demonstrate that Mr. Case was an inventor, and B-K's counsel knew so prior to filing the request for reissue, if not at the filing of the original application.  Yang Decl., Exh. 21.  Additionally, the testimony of Messrs. Gillespie and Case discussed above demonstrates that Mr. Hagen knew they were the true inventors and should have been named as such on the '084 patent.  There can be no doubt that such inequitable conduct has been well pled under the notice pleading requirements of the Federal Rules of Civil Procedure.

**B.**   **Hagen and B-K Failed to Disclose Material Prior Art to the Patent Office**

**1.**   **The Hydrel 7100 and B-K's 360SL Are Material Prior Art**

Mr. Hagen and his patent counsel have committed further inequitable conduct by failing to disclose material prior art to the Patent Office.  *See Monsanto*, 514 F.3d at 1233-34.  In particular, Mr. Hagen did not disclose the two pieces of prior art closest to his invention during <u>either</u> the original prosecution <u>or</u> during the reissue prosecution—the Hydrel 7100 Series light fixture and B-K's own 360SL.[15]  In fact, Hagen and his counsel did not disclose <u>any</u> prior art to the Patent Office in the original prosecution.

Prior art is deemed material and must be disclosed if there is a substantial likelihood the examiner would have considered it important in deciding whether to allow the application to issue as a patent.  *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1362 (Fed.Cir. 1987).  Even withheld prior art that does not render an invention obvious can nonetheless be material.  *Merck & Co. v. Danbury Pharmacal Inc.*, 873 F.2d 1418, 1420-21 (Fed.Cir. 1989).  It is hard to imagine art more relevant to the examination of the '084 patent than the Hydrel 7100 Series fixture and the 360SL.

---

[15] The Hydrel 7100 Series light fixture and the B-K 360SL are discussed extensively in FVC's Motion for Summary Judgment of Invalidity, and those detailed descriptions are incorporated herein by reference.

In his patent, Mr. Hagen states that the "[c]urrently available adjustable mounts for outdoor lighting systems typically utilize a knuckle joint having opposing sides with serrated edges that are rotated to lock together to form the desired light angle."  Yang Decl., Exh. 15 ('084 patent) at col. 1:48-52.  He identifies problems associated with such knuckles, and then describes how the tapered knuckle design of his invention overcomes those problems.  *Id.*, '084 patent at col. 1:51-2:19.  What Mr. Hagen does not discuss is that the Hydrel 7100 Series light fixture used a similar design, *i.e*., a tapered post inserted into a tapered opening, and was prior in time and known to Mr. Hagen and B-K.

As discussed above, Mr. Hagen contends that an invention disclosure statement demonstrates that he was the inventor of the invention claimed in the '084 patent. Accepting as true the technical contents of the document regardless of whether Mr. Hagen or Mr. Case prepared it, the invention disclosure identifies the Hydrel fixture as the closest prior art.  See Section II.2 supra.  Yang Decl., Exh. 16.

B-K produced during discovery a copy of several pages from a Hydrel catalog showing the Hydrel taperlock knuckle.  Yang Decl., Exh. 17.  Notwithstanding that the taper design used by Hydrel is dead-on when compared to the B-K design, and far closer than the prior art discussed in the patent, Mr. Hagen did not disclose it to the Patent Office.  Such art was clearly material and would have been of keen interest to the examiner when examining the application for patentability.  Dornfeld Decl., ¶10. *See American Hoist & Derrick Co.*, 725 F.2d at 1362.

Mr. Case noted in the invention disclosure statement that what set the invention of the '084 patent apart from Hydrel is the integral wireway of the invention.  However, B-K was already using an integral wireway in its prior product, the 360SL, which was on sale as early as 1996.  Yang Decl., Exh. 18. The 360SL was a "mounting knuckle [that] allows vertical to horizontal aiming [and] provides integral wireway and has posilock feature." *Id.*  Moreover, just as the '084 patent identifies the invention as having three principal components—the support member, the base member and the stud member—the 360SL also had three principal components—a support member, a base member and a

stud member.  Only two things set the 360SL apart from the invention:  the use of a tapered post and opening, clearly shown in the Hydrel 7100 Series fixture, and the base member fit inside of the upper opening of the stud member rather than the stud member fitting inside the base opening of the base member.  Both the claimed invention and the 360SL used rotation stop pins to prevent the parts from rotating more than 360 degrees, and used high temperature silicone O-rings to seal out moisture and contaminants.

Significantly, Messrs. Gillespie, Case and Hagen each testified at deposition that they started the development of the claimed invention by trying to "upscale" the 360SL. Yang Decl., Exh. 2 [Case Tr.] at 18:11-19:23; 21:11-22:16; Exh. 4 [Gillespie Tr.] at 22:15-25:5; 26:25-27:17; Exh. 5 [Hagen Tr.] at 91:21-92:21.  When simply re-sizing the components gave unsatisfactory results, Messrs. Gillespie and Case added the tapered post and opening and modified the wireway, used O-rings as before, and used rotational stop pins as before.  Notwithstanding the close resemblance between the prior 360SL and the invention, Mr. Hagen and his attorneys failed to disclose the 360SL to the Patent Office.  Failure to disclose one's own prior art machine that is so clearly relevant to patentability constitutes inequitable conduct.  *Tiegel Mfg. Co. v. Farmer Mold & Machine Works, Inc.*, 225 U.S.P.Q. 1051, 1061 (M.D.Fla. 1984) ("The PTO is particularly dependent upon a patent applicant for prior art information that is uniquely within the knowledge of the applicant, such as the applicant's own prior art machines which are known only in the commercial world and not in the patent literature available to the PTO examiners").

### 2. Intent to Deceive Should be Presumed in Light of High Materiality

Inequitable conduct requires intent to act inequitably.  *Halliburton Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435, 1442 (Fed.Cir. 1991).  Without credible explanation, intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information.  *Bruno Indep. Living Aids v. Acorn Mobility Serv. Ltd.,* 394 F.3d 1349, 1354 (Fed.Cir. 2005).  Proof of deliberate

1  scheming is not needed; gross negligence may be sufficient in light of the circumstances.

2  Gross negligence exists when the applicant or his attorney, judged as a reasonable person

3  in that position, knew or should have known of the materiality of a withheld reference.

4  *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 992 (Fed.Cir. 1988).

5      Clearly, Mr. Hagen will never admit to his failure to disclose.  However, the facts

6  presented above—the clear materiality of the prior art, his taking claim of the invention

7  disclosure statement that identifies the Hydrel fixture as the closest prior art, B-K's

8  possession of the Hydrel 7100 catalog in its files, the use of the 360SL as the starting

9  point in the design—all combine to establish clear evidence of the intent of Mr. Hagen

10  and his counsel to deceive the Patent Office.

11                  **3.      Inequitable Conduct Has Been the Subject of Discovery**

12      B-K alleges that "[n]ot surprisingly, there was no discovery taken regarding the

13  basis for this defense and no evidence of intent to deceive the PTO with respect to any

14  alleged failure to disclose."  Again, not so.  First, Messrs. Case and Gillespie were

15  questioned extensively regarding their involvement in the design of the 360HD, and Mr.

16  Hagen was likewise questioned.  He was questioned regarding the 360SL and the

17  Hydrel.[16]  Yang Decl., Exh. 5 (Hagen Tr.) at 79:5-82:4.   Second, FVC tried to probe B-

18  K's knowledge of Mr. Case's involvement in the design, but B-K refused to produce key

19  documents that may show that involvement.  However, the mere fact that B-K's counsel

20  sought Mr. Case's recollection of the 360HD design during the Kim Lighting litigation is

21  telling of his involvement.  Third, the attorney who wrote the original application leading

22  to the '948 patent was deposed on all of the foregoing topics and conveniently

23  remembered nothing.  Yang Decl., Exh. 19 (Ryan Tr. dated September 20, 2007).  So for

24  B-K to claim that no attempt was made to discover its bad faith is simply false.  To the

25  contrary, B-K's responses demonstrate a continuing attempt to cover up its bad conduct.

26  _____

27  [16] Because B-K withheld the invention disclosure statement discussed above from production until the close of the Case deposition, FVC was precluded from preparing for and examining Case on the statements therein, particularly the identification of Hydrel as the closest prior art. Yang Decl., Exh.

28  16.  FVC anticipates further questioning of Case at trial regarding his and B-K's knowledge of Hydrel.

1    B-K cannot claim surprise or prejudice with respect to the inequitable conduct
2 claims.  To the extent that the Court takes the view that inequitable conduct related to
3 failure to disclose has not been sufficiently pleaded, FVC requests leave to amend to
4 make specific allegations as set out above.  *See Helver v. Novo Industries, Inc.*, 49
5 U.S.P.Q.2d 1591, 1598 (S.D.Fla. 1998)("Because the elements of inequitable conduct are
6 analogous to those of fraud, most courts have required claims of inequitable conduct to
7 comply with Rule 9(b), even though the Federal Circuit has not explicitly voiced this
8 requirement… However, Fed.R.Civ.P. 15(a) allows for the amendment of pleadings
9 'when justice so requires.'…)  Because B-K has not alleged that any prejudice would
10 result from the consideration of the inequitable conduct defense (how could it, given that
11 it is in possession of all the relevant facts?), the Court should consider the merits of the
12 defense even though Defendant has not moved to amend the pleadings at this time.

**VI.    CONCLUSION**

14    For the reasons set forth herein, B-K Lighting's motion for summary judgment as
15 to the validity and enforceability of its patent should be denied.

17 Dated:  April 7, 2008                            /s/ Duane H. Mathiowetz
                                                   _____
18                                                 Duane H. Mathiowetz
                                                   Irene Yang
19                                                 HOWREY LLP

21                                                 Attorneys For Defendant
                                                   FRESNO VALVES & CASTINGS, INC.